664 F.2d 1321
 109 L.R.R.M. (BNA) 2414, 92 Lab.Cas. P 13,183
 SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION, d/b/a Lake Charles
Memorial Hospital, Plaintiff-Appellant,
v.
LOCAL UNION NO. 87, OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION, and Office & Professional
Employees International Union, AFL-CIO,
Defendants-Appellees.
 No. 80-3740.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A*
 Jan. 7, 1982.
 James M. Walters, R. Mason Barge, Atlanta, Ga., Fred H. Sievert, Jr., Lake Charles, La., for plaintiff-appellant.
 Samuel Lang, New Orleans, La., for amicus curiae Louisiana Hospital Ass'n.
 Joseph R. Finley, Princeton, N. J., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before CHARLES CLARK, TATE and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 The appellant, Southwest Louisiana Hospital Association (Hospital) filed a breach of contract suit against Local No. 87, Office & Professional Employees International Union (Union) under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976). The contract in question extended the time for the Director of the Federal Mediation and Conciliation Service (FMCS) to appoint a factfinder to help bring the parties to the bargaining table. The contract also bound the parties to observe the statutory provisions governing Boards of Inquiry, should a factfinder be appointed. The catch to the contract, however, was that the FMCS had to act prior to February 25, 1977. The Hospital claims that the Union violated the statute, thus breaching the contract, by noticing a strike after the FMCS purported to appoint a factfinder. Because we conclude that the factfinder was not timely appointed, we do not consider whether the strike notice violated the statute. Instead, we hold that the Union was not contractually obligated to comply with the statute in the first place. We affirm the district court's judgment for the Union, although not on the grounds relied on by the lower court.
 
 I. THE FACTS
 
 2
 A. The Underlying Relationship of the Parties
 
 
 3
 The events in this case grow out of a controversy at the Lake Charles Memorial Hospital, located in Lake Charles, Louisiana. In 1976, the Union won a contested election and became the certified bargaining representative of the Hospital's employees after the National Labor Relations Board overruled the Hospital's objections to the election. The final tally showed that 171 employees voted for the Union, while 160 voted against it.[1]
 
 
 4
 To force the Union to file unfair labor practices for a refusal to bargain, the Hospital then declined to meet with Union representatives. This is the established and proper means of mounting an election challenge. R. Gorman, Labor Law 60 (1976).[2] The Hospital advised the Union that it would accept a judicial determination of its duty to bargain. The Union, for strategic reasons, however, did not then file charges with the Board. Instead, to avoid the delay in moving a case through the Board and the courts, the Union took more direct action. To aid the Union in its bargaining efforts, the Office & Professional Employees International Union sent a regional representative, Jack Langford, to Lake Charles. On January 25, 1977, Langford began to lay the groundwork for a strike against the Hospital. Langford did this by giving notice to the FMCS that the initial bargaining between the Union and the Hospital had broken down.
 
 
 5
 B. The Particular Statutes Applicable to Health Care Institutions
 
 
 6
 At this point we must explain the statutory framework that guided the actions of both parties in this dispute. A prEecis of the legal context is essential to understand the rather confused events that followed Langford's notice to the FMCS.
 
 
 7
 In 1974, Congress amended the National Labor Relations Act to bring nonprofit private health care institutions under its coverage.[3] Recognizing that labor disputes at a hospital might threaten the continuity of patient care,[4] Congress created special rules for the health care industry.[5] First, Congress added a notice provision to help resolve the breakdown of initial negotiations.[6] When initial contract negotiations do break down, the parties are required to give the FMCS and any local mediation authority 30 days notice of the existence of a dispute.[7]
 
 
 8
 Second, Congress required the FMCS to become actively involved when it learns that the parties cannot reach agreement. The FMCS may arrange meetings to restore or create bargaining relations, and the parties are required to attend. Alternatively, in more serious situations the FMCS may invoke the newly-enacted section 213,[8] the critical statute in this case.
 
 
 9
 Section 213 provides that if the FMCS finds that a threatened strike would disrupt local health care substantially, it may, within ten days of receiving the thirty day notice that initial bargaining has collapsed, convene a Board of Inquiry. The Board of Inquiry is charged with looking into the dispute, making a report, and submitting suggestions to the parties on how to reach accord. The Board of Inquiry must complete its report within fifteen days after it is established. In addition, from the time the Board is convened until fifteen days after it issues its report, the parties must maintain the status quo that existed before impasse.
 
 
 10
 Third, Congress created a new limitation upon strikes in the health care industry.[9] A union must give ten days notice to the FMCS and the hospital before it may strike or picket. This provision allows a hospital to avoid disruptions of patient care. Moreover, when a party has sent a thirty-day notice to the FMCS that initial bargaining efforts have failed, a union may not serve a ten-day strike notice on a health care institution until the thirty days have elapsed. Thus, a cooling-off period is imposed on the parties to allow the FMCS mediation efforts to proceed in an atmosphere free from coercion.
 
 C. The Events of January and February
 
 11
 With these statutory provisions in mind, we return to Lake Charles. When Langford sent notice of a labor dispute to the FMCS on January 25, the thirty-day period in which the Union was forbidden to serve notice of a strike began to run. Thus, the first day on which Langford could have noticed a strike was February 25. In addition, the last day for the FMCS to appoint a Board of Inquiry under section 213 was February 4, ten days after the Union served the thirty-day notice. Richard Bible, the local FMCS representative, then asked Langford to sign a stipulation extending the time for the FMCS to appoint a Board of Inquiry.[10] The stipulation was a standard form with blanks for the extended date and the names of the parties.[11]
 
 
 12
 The proposed stipulation extended the time for the FMCS to act until "any time prior to February 25, 1977." That date was chosen so that if the FMCS failed to appoint the factfinder in lieu of a statutory Board of Inquiry before February 25, Langford could go ahead with the strike plans. Langford signed on February 1; two days later, on February 3, the Hospital signed, thus creating the agreement that is the basis for this suit.
 
 
 13
 Despite the extension, or perhaps because of it, the FMCS did nothing until February 24, a Thursday.[12] On that date the FMCS began the process of appointing a factfinder, but made no attempt at that time to notify the Union or the Hospital of its action. Langford, meanwhile, had scheduled a meeting of Union members for Thursday, February 24. Having heard nothing from the FMCS by the end of the day, Langford held the meeting; the members voted to strike. The next day, Friday, February 25, Langford sent a letter to the Hospital noticing a strike for Tuesday, March 8, eleven days later.
 
 
 14
 The following Monday, February 28, the National Labor Relations Board derailed Langford's plans by telling him that the Hospital had not received his strike notice until that morning and therefore the ten-day notice period would not be satisfied by the date set for the strike. But before Langford could fix the deficiency, the factfinder that the FMCS purported to appoint, Samuel Nicholas, called to inform Langford of the appointment. Langford had received no official word of Nicholas's appointment from the FMCS. He knew, moreover, that the stipulation between the Union and the Hospital required the factfinder to be appointed "prior to February 25." In light of these facts, Langford went ahead and noticed a new strike for March 11, eleven days later. Later that day Langford received a mailgram from the FMCS dated February 26 informing him that "Samuel J. Nicholas is hereby appointed effective February 25, 1977 as a factfinder in the dispute between Lake Charles Memorial Hospital and Office & Professional Employees Intl. Union, Local 87."
 
 
 15
 Between February 28 and March 7, the Union and the Hospital maintained a tense silence with regard to the strike.[13] The Hospital broke the silence on March 7 to inform the Union that a strike would be illegal in view of the appointment of the factfinder, and, moreover, it would breach the parties' stipulation of February 1 and February 3. Langford did not respond directly to the Hospital, but uncertain whether the factfinder had been timely appointed under the stipulation, he called Richard Bible, the local FMCS mediator. Bible referred the matter to Washington, from which issued the cryptic response that Nicholas's appointment was effective on February 25, and that the parties were bound to maintain the status quo until March 26.
 
 
 16
 Because of doubt about the strike's legality, on March 8 Langford told the local press that the strike might be delayed. The Executive Director of the Hospital read the newspaper stories on the possible delay of the strike. On March 10, Langford told counsel for the Hospital that the strike was off. No strike in fact occurred.
 
 
 17
 Less than one week later the Hospital filed this suit for damages under Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185 (1976). The theory of the Hospital's action was that the Union had contracted to follow the procedures of Section 213 if the FMCS timely appointed a factfinder in lieu of a Board of Inquiry. Because a factfinder was properly appointed, the Hospital argued, the Union was bound to maintain the status quo pending the factfinding investigation. The Union's strike notice, in the Hospital's view, breached the status quo, thus forcing the Hospital to prepare for the strike and causing it to incur damages. In an unreported decision the district court, after a trial, held that a factfinder had been timely appointed, but concluded as a matter of law that a strike notice by itself does not breach the status quo required under section 213. The court therefore found for the Union, and the Hospital appealed.
 
 II. JURISDICTION
 
 18
 Initially, we must determine a question of federal jurisdiction. The stipulation between the Union and the Hospital clearly comes within the scope of section 301. The Union argues, however, that the stipulation deprives the federal courts of jurisdiction by relegating the parties to unfair labor practice proceedings before the National Labor Relations Board. We disagree.
 
 
 19
 The stipulation provides that "the appointed factfinder and parties shall be governed by the procedures that would otherwise have been operative had a statutory Board of Inquiry been convened under Section 213 of the Labor Management Relations Act, 1947, as amended." The Union maintains that by agreeing to be governed by the procedures of section 213, the Hospital bound itself to invoke only the administrative remedy for a breach of section 213. Thus, according to the Union, the sole remedy for the Union's alleged violation of section 213 is to file a charge with the NLRB.
 
 
 20
 We do not accept the Union's reading of the stipulation. On its face, the stipulation says nothing about remedies. It merely does two things: it extends the time for the Director of the FMCS to appoint a factfinder, and it provides that section 213 procedures shall govern the appointed factfinder and the parties. Neither aspect of the stipulation purports to make administrative proceedings an exclusive remedy.[14] Thus, even if a failure to observe the status quo under section 213 could have been remedied through an unfair labor practice proceeding in this case-a question on which we express no opinion-it is well settled that if the same conduct breached an agreement within the scope of section 301, federal courts are free to hear the contract action. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); International Union v. E-Systems, Inc., 632 F.2d 487 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981).
 
 
 21
 The Union suggests that to find jurisdiction here would deter unions from signing stipulations like the one in this case for fear of exposing themselves to section 301 actions in federal courts. In the absence of such stipulations, the Union contends, fewer Boards of Inquiry would be appointed since the FMCS has only ten days to act under the statute in an initial contract dispute, and this is frequently too short a time. The discouragement of stipulated extensions, it is argued, would impair the FMCS's ability to help resolve impasses in the health care industry. This argument may reveal shortcomings in the statute, but it does not bear upon our power to act. We therefore conclude that a stipulation that extends the FMCS's time to appoint a factfinder under section 213 and provides that section 213 procedures will govern may support federal jurisdiction under section 301.
 
 III. TIMELINESS OF THE APPOINTMENT
 
 22
 We now turn to the question whether the FMCS appointed the factfinder within the time allowed by the stipulation. The stipulation permitted the FMCS to appoint a factfinder at any time prior to February 25. Thus, to accomplish the appointment the FMCS must have completed all that was necessary for it to do by February 24. A review of the facts and the applicable law reveals that the appointment was not made by February 24.
 
 
 23
 The FMCS waited until February 24, the last day possible, to begin the appointment process. At that time, Jewell T. Myers of the FMCS, following customary FMCS procedure, called an arbitrator, Samuel Nicholas, to see if he was available to serve as the factfinder. Because Nicholas was not in his office on that Thursday afternoon, Myers spoke with his secretary, Martha Kelsey. Kelsey told Myers that Nicholas was available to serve as the factfinder, and that she would accept the assignment for him, as she was authorized to do, subject to his confirmation. Nicholas's standard practice was to confirm all appointments made in his absence. In Myers's deposition, she recounted the conversation she had with Martha Kelsey concerning Nicholas's confirmation:
 
 
 24
 (Kelsey said) (t)hat she would get back in touch with me.... I told her it was urgent. I needed to talk to him (Nicholas) that day because I had this special fact finding case that had an effective date of 2/25/77, and I needed to know that day if he would take the case.
 
 
 25
 Not until the next day, however, February 25, did Nicholas return to his office and call the FMCS to confirm his availability. And not until February 26 did the FMCS send a mailgram to Nicholas, and copies to the parties, officially appointing Nicholas as the factfinder. That mailgram, moreover, stated that Nicholas was appointed the factfinder in the Lake Charles Hospital dispute "effective February 25."
 
 
 26
 On these facts, it is plain that the FMCS failed to make a timely appointment. The events of February 24 left Nicholas's appointment in limbo. Not only was it left for Nicholas to confirm his availability; the FMCS, the only body with power to make the appointment, withheld the official written communication of the appointment until it spoke with Nicholas personally. The written communication officially appointing Nicholas was not a mere formality. The FMCS's own "Guidelines for Board of Inquiry" give it greater stature. Guideline 5 states: "A BOI will be established upon the effective date set in the official written appointment communication from the National Director." Moreover, the FMCS did nothing to inform the parties of its purported appointment on February 24 even though if a factfinder had been appointed on that date the parties would have been under a new obligation to maintain the status quo.
 
 
 27
 Under the age old but still viable test of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) the FMCS did not complete the appointment of Nicholas by February 24. In Marbury, the Court addressed the question whether President John Adams had completed his appointment of Samuel Marbury as a Justice of the Peace for the District of Columbia before leaving office, as a preliminary matter to addressing the questions for which the case is better known. The Court held that President Adams had completed the appointment because he had performed the last act that was required of him.
 
 
 28
 The last act to be done by the president is the signature of the commission.... This appointment is evidenced by an open, unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and inconclusive transaction.
 
 
 29
 5 U.S. at 157. Here, by contrast, the FMCS's actions on February 24 were nothing but inconclusive. The FMCS delayed issuing its official appointment communication precisely because it was waiting to speak to Nicholas personally. It did not inform the parties of its action on February 24, and it did not make February 24 the effective date of Nicholas's appointment when it did issue the official communication.
 
 
 30
 The district court concluded that FMCS made the appointment on February 24 and that Nicholas accepted it on February 25, relying on the distinction in Marbury v. Madison between an appointment and an acceptance. 5 U.S. at 161. We think that the district court incorrectly interpreted Nicholas's confirmation as an acceptance of an appointment already made. Rather, the appointment itself was incomplete on February 24 because the FMCS refrained from completing it until speaking with Nicholas personally. Further, Nicholas could have declined. Surely if he had waited several days and then accepted the February 24th request, this would not be sufficient. The critical point is that the delay was specifically and overtly prejudicial to the rights of the Union established by the stipulation. The Union was entitled to strict compliance with the agreed time limits.
 
 
 31
 In holding that the FMCS failed to make a timely appointment here, we do not suggest at all that appointment can never be made by telephone, or that an agent can never accept an appointment. We hold only that on the facts of this case Nicholas's appointment obviously was not completed by February 24, the date required by the stipulation.
 
 IV. STATUS QUO
 
 32
 The district court held that a strike notice alone does not breach the status quo under Section 213. The court relied on Section 213's failure specifically to prohibit threats to strike. Cf. District 1199-E, National Union of Hospital & Health Care Employees, 227 N.L.R.B. 132 (1976) (a threat to strike does not breach Section 8(d) because that section, unlike other sections to the National Labor Relations Act, does not specifically prohibit threats). Because we hold, in contrast to the district court, that the appointment was not timely made, we conclude that the Union was under no obligation to maintain the status quo. Thus, we pretermit the issue of whether a strike notice for an illegal strike would violate the status quo under Section 213.
 
 
 33
 The Union deserves the recognition here that it acted in good faith throughout this dispute. When the Union gave the first strike notice, it had no way of knowing that the FMCS had contacted Nicholas. Even when it gave the second strike notice, the Union had heard nothing official from the FMCS, nor was there any reason for the Union to believe a timely appointment had been made. Finally, when the Hospital protested that Nicholas had been timely appointed, the Union made appropriate inquiries and eventually called off the strike. The status quo between these two parties had for some time been a silent confrontation within the bounds of the law; in this state of affairs, we would be hard pressed to conclude that the Union's good faith conduct breached that status quo.
 
 CONCLUSION
 
 34
 Though we differ from the district court's reasoning, we hold that it properly granted judgment for the Union.
 
 
 35
 AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 Southwest Louisiana Hospital Ass'n, 232 N.L.R.B. 1039, 1040 (1977) enforced per curiam, NLRB v. Southwest Louisiana Hospital Ass'n, (5th Cir. Sept. 18, 1978) (unpublished)
 
 
 [2]
 After the events giving rise to this suit had occurred, the Union did bring charges against the Hospital under Section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976), for the Hospital's refusal to bargain in good faith. The General Counsel issued a complaint and the Board ordered the Hospital to bargain. 232 N.L.R.B. 1039 (1977). We enforced this order in NLRB v. Southwest Louisiana Hospital Ass'n. (5th Cir. Sept. 18, 1978) (per curiam unpublished opinion), finding the Hospital's objections to the election without merit
 
 
 [3]
 Nonprofit health care institutions were covered by the original Wagner Act, 49 Stat. 449 (1935), but the Taft-Hartley Act removed them from the Act's coverage in 1947, 61 Stat. 136 (1947)
 
 
 [4]
 S.Rep.No.93-766, 93d Cong.2d Sess., reprinted in (1974) U.S.Code Cong. & Ad.News 3946, 3948
 
 
 [5]
 The 1974 Amendments brought nonprofit health care institutions under the Board's jurisdiction for the first time since 1947; health care institutions operated for profit had already been covered. The new provisions added by Congress in 1974 apply to both private and nonprofit health care institutions, however
 
 
 [6]
 Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection
 29 U.S.C. § 158(d)(B).
 
 
 [7]
 Congress also lengthened the notice periods before a party may terminate or modify an existing contract in the health care industry. See 29 U.S.C. § 158(d) (1976)
 
 
 [8]
 Section 213, codified at 29 U.S.C. § 183 (1976) provides, in pertinent part:
 Establishment of Boards of Inquiry;
 membership
 (a) If, in the opinion of the Director of the Federal Mediation and Conciliation Service a threatened or actual strike or lockout affecting a health care institution will, if permitted to occur or to continue, substantially interrupt the delivery of health care in the locality concerned, the Director may further assist in the resolution of the impasse by establishing within 30 days after the notice to the Federal Mediation and Conciliation Service under clause (A) of the last sentence of section 158(d) of this title (which is required by clause (3) of such section 158(d) of this title), or within 10 days after the notice under clause (B), an impartial Board of Inquiry to investigate the issues involved in the dispute and to make a written report thereon to the parties within fifteen (15) days after the establishment of such a Board. The written report shall contain the findings of fact together with the Board's recommendations for settling the dispute, with the objective of achieving a prompt, peaceful and just settlement of the dispute. Each such Board shall be composed of such number of individuals as the Director may deem desirable. No member appointed under this section shall have any interest or involvement in the health care institutions or the employee organizations involved in the dispute.
 Maintenance of status quo
 (c) After the establishment of a board under subsection (a) of this section and for 15 days after any such board has issued its report, no change in the status quo in effect prior to the expiration of the contract in the case of negotiations for a contract renewal, or in effect prior to the time of the impasse in the case of an initial bargaining negotiation, except by agreement, shall be made by the parties to the controversy.
 
 
 [9]
 A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d) of this section. The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of the parties
 29 U.S.C. 158(g) (1976).
 
 
 [10]
 Bible requested more time for the FMCS to act because courts have rebuffed the FMCS's attempts to appoint Boards of Inquiry after the time given by the statute has passed. In a different but comparable context, Affiliated Hospitals of San Francisco v. Scearce, 418 F.Supp. 711 (N.D.Cal.1976), affirmed, 583 F.2d 1097 (9th Cir. 1978) (per curiam), the FMCS argued that it had authority to appoint a Board of Inquiry within thirty days of the last possible day on which a party could have given notice of its intent to terminate a collective bargaining agreement, even if the notice had actually been given earlier. The Ninth Circuit disagreed, holding that the FMCS's authority was limited to appointing a Board of Inquiry within thirty days of receiving actual notice. Accord: Sinai Hospital of Baltimore, Inc. v. Scearce, 561 F.2d 547 (4th Cir. 1977). Similar reasoning would preclude the FMCS from appointing a Board of Inquiry more than ten days after receiving actual notice of a breakdown of original contract negotiations
 
 
 [11]
 The stipulation provided:
 In keeping with the intent and purpose of Public Law 93-360, IT IS HEREBY STIPULATED AND AGREED that, in the event the parties have not reached agreement on the terms and conditions of employment, the Director of the Federal Mediation & Conciliation Service may, at any time prior to February 25, 1977 appoint an impartial third-party to serve as a fact finder to assist the parties in resolving their dispute.
 IT IS FURTHER STIPULATED AND AGREED that the appointed fact finder and parties shall be governed by the procedures that would otherwise have been operative had a statutory Board of Inquiry been convened under Section 213 of the Labor-Management Relations Act, 1947, as amended.
 
 
 [12]
 In the meantime labor relations between the Hospital and the Union showed no signs of improving. On February 12, the Union picketed the Hospital for two hours. The Hospital filed charges with the National Labor Relations Board under Section 8(g) because the Union had given no notice of the picketing. That charge was settled with an agreement by the Union to post a notice to its members that the Union would not strike or picket without giving the required notice. See Samuel J. Nicholas, Board of Inquiry, Findings of Fact and Recommendations (March 10, 1977)
 
 
 [13]
 The Hospital, though, began to prepare for a strike by scheduling staff meetings to plan for the strike; purchasing concrete blocks to protect the Hospital's vital supplies; installing an eight foot high chain-link fence around the rear of the Hospital; increasing the security personnel; and, decreasing the number of non-emergency patient admissions
 
 
 [14]
 Because of our interpretation of the stipulation, we need not reach the question whether parties to such a stipulation have the power to make unfair labor practice proceedings before the NLRB the exclusive remedy for breaches of the agreement, and thus preclude a section 301 suit